IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

SEBASTIAN D. GOLDMAN,              )
                                   )
           Plaintiff,              )
                                   )
vs.                                )        Case No.  2:07-cv-1883-TMP
                                   )
CITY OF HUEYTOWN, a Municipal      )
Corporation; HUEYTOWN POLICE       )
DEPARTMENT; MAYOR DELOR            )
BAUMANN; DOUG McBEE,               )
Individually and Acting As Hueytown )
Chief of Police,                   )
                                   )
           Defendants.             )


**<u>MEMORANDUM OPINION</u>**

This action is before the court on the motions for summary judgment filed by defendants City of Hueytown ("Hueytown"), Delor Baumann, and Doug McBee.  The motions were filed on December 31, 2008, and were supported by a joint evidentiary submission.  The plaintiff filed a brief in opposition along with evidence in support thereof.  The defendants filed a reply.  After additional discovery was allowed by the court, the plaintiff filed a supplemental opposition to the motions for summary judgment, supported by additional evidentiary material.  The defendants filed a reply on June 15, 2009.  Accordingly, the matter has been fully briefed.  All parties have consented to the exercise of jurisdiction by the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).  For the reasons set forth herein, the court finds that the defendants' motions for summary judgment are due to be granted in part and denied in part.

## SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Celotex, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." Id. at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. Celotex, 477 U.S. at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient

to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52; see also Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 745 n.11 (1983). However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. Anderson, 477 U.S. at 254; Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts

3

are the function of the jury, and therefore the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor. Anderson, 477 U.S. at 255. The non-movant need not be given the benefit of every inference but only of every reasonable inference. Brown v. City of Clewiston, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).


FACTS

Viewing the evidence in the light most favorable to the plaintiff, the following undisputed facts are relevant to the instant motion.

Plaintiff Sebastian Goldman, an African-American male, was hired by the defendant City of Hueytown as a police officer in June 1998. He was transferred to Hueytown from the City of Fairfield, where he had served as a police officer. At all times, Goldman also has been a member of the United States Army Reserve, now holding the rank of captain. He has been on active duty with the United States Army (consequently, not working actively as a Hueytown police officer) since November 2004.

Defendant Doug McBee was, at times relevant to this lawsuit, the police chief for Hueytown, taking that position in November 1998, after plaintiff joined the police department. Defendant Delor Baumann was elected the mayor of Hueytown in October 2004.[1] The plaintiff asserts that he was discriminated against on the basis of his race and his military service, in that he has been denied promotions to the position of sergeant and has been denied the opportunity to obtain additional

---

[1]    At the time plaintiff joined the Hueytown police department in 1998, the mayor was Mayor Hicks. Then, from 2000 to 2004, the mayor was Joe Williams. Neither of these previous mayors is named as a defendant in this action.

4

training.  Goldman further asserts that he has been subjected to retaliation for having complained about the defendants' discriminatory practices.

Goldman filed a charge of discrimination with the Equal Employment Opportunity Commission on March 7, 2006, alleging that he had been denied training opportunities and promotions based upon his race and in retaliation for having complained of discrimination.[2]  He filed the complaint timely commencing this action on October 17, 2007, asserting claims of race discrimination and retaliation arising under Title VII, 42 U.S.C. § 2000e, 42 U.S.C. § 1981, and 42 U.S.C. § 1983.  He further alleges discrimination on the basis of his military service arising under the Uniformed Services Employment and Reemployment Rights Act, 43 U.S.C. § 4301 *et seq*. ("USERRA").

A.  Employment History

Shortly after Goldman was hired by Hueytown in June 1998, Doug McBee, a Caucasian male, was hired as the chief of police.  When McBee became the chief of police, there were two African-American police officers in Hueytown and approximately 24 Caucasian officers.  One other African-American officer has been hired since that time.  (Plaintiff's Ex. 11).  No African-American has  held the rank of sergeant or higher within the Hueytown Police Department. Goldman is the only African-American officer within the Hueytown force who has taken or passed the sergeant's exam, making him eligible for such promotion.

_____

[2]      Goldman also filed a charge of discrimination in 2003, but never filed a lawsuit arising out of it.

During the plaintiff's employment as a police officer with the City of Hueytown, he received seven annual employment performance evaluations as mandated by the Jefferson County Personnel Board rules and regulations.  Most of plaintiff's evaluations rated him as an officer who "meets expectations."  On two of the seven evaluations he received at Hueytown —  in 1999 and 2002 — he received some scores of "needs improvement." In addition to performance evaluations, Goldman's record as a police officer reflects two memoranda of commendation.  On June 11, 2002, a Hueytown resident wrote a letter commending Goldman's performance in helping her with her injured mother, and on July 8, 2004, Goldman received a memorandum of commendation from Chief McBee for his performance in apprehending a fleeing robbery suspect.

In October 2004, Delor Baumann was elected mayor of the City of Hueytown.  Baumann was the direct supervisor of the chief of police.  McBee, as police chief, was the direct supervisor of police officers.  Sergeants and lieutenants, none of whom is a defendant in this action, also had supervisory responsibilities over Goldman.   Baumann was responsible for evaluating the performance of McBee.  Only one performance evaluation for McBee has been produced in this lawsuit.  The 2004 evaluation of McBee indicates that Baumann rated McBee as both "needs improvement" and "below expectations." McBee's career in law enforcement prior to becoming the chief in Hueytown was less than stellar.  McBee worked on the police force in Birmingham, where he was twice charged with driving a city vehicle while drunk, was found guilty of falsely reporting that he had been in court, and was found guilty of running criminal background checks as a "side job" for a corporation.  He was subjected to other disciplinary measures including demotion and suspensions.

6

Goldman has one reprimand and one suspension in his record as a Hueytown police officer.[3] The reprimand occurred after a November 13, 2003, incident in which Goldman and a Caucasian police officer, Brent Rankin, were involved in a physical altercation. Both Rankin and Goldman were charged with the same disciplinary offenses. Both Goldman and another witness to the event, Hueytown's other African-American police officer, contend that Rankin was the initial aggressor and that Goldman was defending himself. Rankin and other Caucasian officers who witnessed the event contend that Goldman was the initial aggressor. After an investigation of the incident, McBee made the decision to suspend Rankin for one day without pay, and to suspend Goldman for five days without pay. McBee says the different punishments were related to the ascertainment of who was the aggressor.

Goldman was involved in two incidents when off-duty in 2000. He was on the property of the University of Alabama at Birmingham in May 2000, where his wife worked. UAB police officers wanted to talk to Goldman's wife about thefts of files that had occurred in the office. UAB officers described Goldman's conduct as "rude" and "arrogant," "threatening and unprofessional," and "unbecoming of one officer to another." The second incident occurred in August 2000, when UAB police were investigating a theft. UAB Corporal Shawn Rankin[4] attempted to interview Goldman, and told him he needed to "read him his rights." Goldman loudly stated that he would not talk to him, and told Rankin to leave the room. Rankin described Goldman as "irate," "loud," and

---

[3]     There is evidence that Goldman had disciplinary issues when he was employed as a Fairfield police officer, prior to transferring to the Hueytown. One of these apparently involved a misdemeanor conviction for domestic violence.

[4]     Neither party addresses whether UAB's Shawn Rankin and Hueytown's Brent Rankin are related.

"menacing." Hueytown was made aware of both incidents, and McBee directed that the internal affairs department conduct an investigation into Goldman's conduct.  UAB never charged Goldman with any offense, and Hueytown never imposed any disciplinary action on Goldman as a result of the incidents or the investigation.  Goldman's performance evaluation given in November 2000, after the 2000 events, indicated that he "meets expections" in all categories.

Early in January 2004, McBee was asked by then-Mayor Joe Williams to "look into" a 2002 incident for "possible personnel action."  McBee has stated that is was "not normal" to be asked to review a two-year-old incident. The incident was investigated, and the report prepared as a result indicated that Goldman had been responding to a report of a crime.  At the scene, one of the people inside the house had said that the suspect was a "nigger," and used racial remarks repeatedly in Goldman's presence.  The language upset Goldman, and he went to his car to complete his report instead of remaining in the house.  Sgt. Brown said he "concurred" with Goldman's actions.  McBee has agreed that Goldman acted appropriately.  Accordingly, no disciplinary action was taken.

### B.  Promotions Sought

During his tenure as a police officer at the City of Hueytown, Goldman repeatedly sought promotion to a position as a sergeant.  The sergeant positions require applicants to pass the Jefferson County Personnel Board exams.  Once the exams are passed, officers are ranked and placed on a certificate of eligibles list, which is made available to the hiring city.  Until at least April 2005, the

Personnel Board ranked the eligible candidates based on test scores and seniority.[5]  The list of eligibles was routinely reviewed by McBee, who conducted interviews and made recommendations for hiring and promotion.[6]  McBee would recommend the candidate he wished to hire for vacant positions in the police department.  The mayor had the authority to approve or reject the recommendation.  In each instance of promotion relevant to this lawsuit, McBee's recommendations were followed by the mayor without discussion or dispute.  There is no indication that the mayor had any input into the decision other than signing off on the recommendation.

In deciding upon his recommendations, McBee has stated that he would consider the employee's conduct, performance evaluations, letters of commendation, and seniority.  Baumann has testified that he expected McBee to interview all applicants whose names appeared on the list of eligibles.  Both McBee and Baumann have testified that qualifications of an applicant cannot be evaluated properly unless the applicant is interviewed.

Goldman first took and passed the sergeant's exam in 1998, before he was hired by Hueytown.  In 1990, Goldman received a bachelor's degree from the University of Alabama at

---

[5]     "Seniority points" are added to the test scores to arrive at a total score by which the applicants are ranked.

[6]     Plaintiff asserts that until the Personnel Board stopped giving ranking information to hiring entities, Hueytown was required to promote based on the rank provided on the list. None of the evidence produced to this court shows the candidates for those posts in a ranked order, and the evidence does not support the conclusion that it was mandatory for any hiring entity to promote the top-ranked candidate.  In any event, there is no dispute that the Personnel Board stopped providing scores or ranks on the certificates of eligibles by no later than April 2005.  As discussed *infra*, the only promotions for which plaintiff's Title VII, § 1981, or § 1983 claims are not time-barred occurred after April 2005. Accordingly, the numbered rank is not relevant to the instant claims and, even if it were, the court has insufficient evidence from which to determine whether Goldman was more highly graded by Personnel Board rankings than the candidates Hueytown ultimately selected.

Birmingham, with a double major in communications and criminal justice. Goldman sought sergeant positions in 1998 and 1999, but was told that he had not been chosen because of his lack of seniority. In late 2000, a sergeant position became available. Goldman was on the list of eligibles along with several other candidates. McBee interviewed only one candidate, Donald Bradley, a Caucasian male. Bradley received the promotion to sergeant on January 4, 2001. Goldman was told that the decision was based on seniority. Goldman was not told that the incidents in 2000 with UAB police had any bearing on the decision to promote Bradley over him.

In 2003, another sergeant position became available. Goldman was placed on the list of eligibles. McBee interviewed and hired Caucasian officer Chris Essman on September 25, 2003. Essman was the only candidate interviewed for the sergeant position. Goldman was more senior than Essman.

Another sergeant position became available in 2004, and Goldman remained on the list of eligibles. On September 9, 2004, McBee hired Caucasian officer Steve Gamble for the position. Goldman was never interviewed for the position. Goldman had worked as a police officer longer than had Gamble, but Gamble apparently was hired by Hueytown a year before Goldman was hired.[7]

On August 25, 2005, Caucasian officer Mark Didcoct was promoted to the position of sergeant. Didcoct had been on Hueytown's police force since 1997.[8] Goldman was on the list of eligibles for the 2005 position, but was never interviewed. Only two candidates were interviewed,

_____

[7]      It is not clear whether Goldman refers to "seniority" as total years of experience in law enforcement, including with other jurisdictions, or just the years of experience on Hueytown's police force.

[8]      The dates of hire for Didcoct and Gamble are not recited in plaintiff's brief, but are evident from the personnel files supplied by defendants. (Defendants' Exs. 10 and 11).

and both are Caucasian.  Baumann has testified that Goldman should have been considered for the position.  Baumann admits that he did not review any records or otherwise determine how many candidates McBee had interviewed.

In 2006, Goldman remained on the list of eligibles for sergeant positions.  On January 26, 2006, Caucasian officer Richard Riley was promoted to the position of sergeant.  Goldman had more seniority on the Hueytown police force than did Riley, but apparently had more total police experience.[9]  McBee interviewed only Riley for the position.  Baumann asked McBee whether he had interviewed anyone else for the position, but he "does not recall" what McBee told him in response.  Baumann has testified that he would have been concerned if McBee had interviewed only Riley for the position.

On February 22, 2007, Caucasian officer Chris Taylor was promoted to the position of sergeant.  Goldman had more seniority than Taylor.  Goldman was on the list of eligibles for the position, but was never interviewed for the position.  McBee recommended Taylor for the job and Baumann approved it.

On December 27, 2007, Caucasian officer Brent Rankin, the officer with whom plaintiff had had a confrontation in 2003, was promoted to the position of sergeant.  Goldman appeared on the list of eligibles for that position, but was never interviewed.  Rankin had received a one-day suspension as a Hueytown officer for the same incident in which Goldman had received a five-day suspension.

---

[9]      Plaintiff's Ex. 12 is the 2005 list of eligibles for the sergeant's position.  In a space next to Riley's name is a notation  saying "31 yrs. exp."  Similarly, next to Didcoct's name is the notation "13 yrs. exp."

Goldman complained to his sergeant and his lieutenant that he had not been promoted.  He was told that he was not promoted because of the "powers that be."  When Goldman asked McBee why he had not been promoted, McBee said it was the mayor's decision.  Early on in his employment with Hueytown, Goldman had been told that seniority was the basis of promotions.  After Goldman became more senior than others who were promoted, he was told that promotions were based on performance, as well as seniority.

C.  Training Opportunities Sought

Goldman also complains that he was denied training opportunities as a result of his race and/or military service.  Goldman requested to attend firearms instructor schooling, drug intervention school, marijuana identification school, Spanish for patrol officers classes, DARE school, SWAT school, special weapons and tactics school, and investigators school during his employment with the City of Hueytown.  Goldman was never allowed to attend any of the requested training, although Caucasian officers were allowed to attend.  At times, Goldman was told either that no one would be allowed to attend or that the classes were going to be brought into the department.  In those cases, however, Caucasian officers were ultimately sent to the training and Goldman was not allowed to attend.  In one instance in or about August 2003, Goldman scored a 90 or above on a firearms test.  His was the highest qualifying score.  McBee had announced that all who attained that score would be allowed to attend a firearms instructor school, to train to become a firearms instructor.  Goldman scored high enough to attend, but was afterward told by McBee that none of the eligible officers would attend.  Contrary to what Goldman was told, a Caucasian employee was sent to the training.

On October 15, 2003, Goldman complained in writing to Sgt. Chris Essman when he was denied the opportunity to attend firearms instructor school, but Essman only replied that the decision not to send Goldman to the training was not made by Essman.  (Plaintiff's Ex. 19).

### D.  Military Service

Goldman is a member of the United States Army Reserve.  He first enlisted in January 1995, and has remained in military service since that time.  In November 2004, Goldman was called to active military duty and has remained on active duty since that time.[10]  Goldman received excellent evaluations throughout his tenure in the military.  His performance has consistently been ranked as "exceeded expectations."  He also has been promoted to Army captain.

McBee was aware of Goldman's military service, and Goldman informed McBee that he had received a promotion from the Army to the rank of lieutenant.  McBee has testified that he did not and would not consider Goldman's military experience in determining whether he might be qualified for a sergeant position.  McBee told Goldman that he did not want to promote Goldman to sergeant because Goldman would probably leave and go on active duty, or would not be available for work because of his military commitments.  Lieutenant Joe Williams, also a supervisor within the Hueytown police department, told Goldman in 2000 that if Hueytown had known that Goldman was an active member of the military the City would not have hired him.

---

[10]     Goldman apparently was on active duty at the time briefing took place in February 2009.  It is not clear whether he is still on active duty at the time this opinion is being written.

E.  Complaints of Discrimination

Goldman filed his first charge of discrimination with the EEOC on November 6, 2003, asserting that he had been subjected to discrimination on the basis of race.  He specifically mentioned a training course which he was denied the opportunity to attend, and the sergeant position that he was denied in 2003.  Goldman did not file any action in court after the resolution of the claim with the EEOC.

On November 14, 2003, Goldman wrote a letter of complaint to Hueytown and the Jefferson County Personnel Board, asserting that he had never seen the city hire black males or females in the police department, and that the police department had created a "hostile working environment." McBee knew of Goldman's complaints and understood that they were racial in nature.  Less than a week later, on November 20, 2003, McBee made the decision to suspend Goldman for five days as a result of the altercation with Rankin, while Rankin was suspended for only one day.

On January 15, 2004, Goldman submitted a written complaint to Sgt. Walters within the Hueytown police department regarding a white employee who had worked as a dispatcher.  Goldman complained that the dispatcher had asked Goldman how big his penis was.  Goldman's complaints were not investigated, and the only action taken was to instruct Goldman to stay out of the dispatch area.

Goldman also complained of an incident in which a copy of a page from a dictionary was placed on the roll call table in the police department.  An asterisk had been placed by the word "degenerate" and in the margin the words "niger" and "black" were highlighted.  The paper was left on the roll call table where police officers report at the beginning of their shifts.  Goldman believed

the note was racially motivated and was directed to him personally.  Goldman further has complained about an incident involving Sgt. Hagler, a Caucasian police officer.  Hagler asked Goldman about some songs on the radio and insisted that Goldman should know the songs because Goldman is black.  Goldman complained to Sgt. Brown, but Brown took no action.  Goldman also asserts that Officer Rankin repeatedly joked and laughed about an incident in which a person had referred to some figurines as "niggers."  Goldman complained about the incident to Sgt. Brown, but no action was taken.  Finally, Goldman asserts that, because of his race, other police officers would fail to provide backup for him when he called for assistance.  Goldman contends that only Officer Washington, who is African-American, and Officer Knizel, who is Caucasian, would respond to his calls.  When Goldman complained about the lack of backup support, Sgt. Brown told him "Oh, they know that you filed a discrimination charge against them and I was just letting you know that they knew."

On March 6, 2006, Goldman filed his second charge of discrimination with the EEOC, asserting claims of racial discrimination and retaliation.  It is this EEOC charge that gives rise to the instant Title VII claims.  In the 2006 EEOC charge, Goldman complained that he was repeatedly denied promotions to sergeant and was denied the opportunity for additional training because of his race.

Both McBee and Baumann admit they were aware of Goldman's complaints of discrimination.  Baumann has asserted that any EEOC charge should be taken seriously and should be investigated.  Baumann is unaware of any investigation regarding Goldman's complaints or racial animus.  Baumann does not recall instructing McBee or anyone else to investigate Goldman's

complaints.  Baumann never talked with Goldman regarding his complaints, even though he was aware that Goldman was complaining about actions by Chief McBee.  McBee has testified that a complaint of race discrimination merits investigation only where the complaint "bears weight."  He does not allege that he conducted any investigation as a result of any of Goldman's complaints of discrimination.

<u>DISCUSSION</u>

A.  <u>Timeliness Of Racial Discrimination Claims Against The City Of Hueytown</u>

Plaintiff Goldman contends that he was denied training opportunities and promotions by the City of Hueytown on account of his race.  In its motion for summary judgment, the City asserts that most of the claims are barred by the applicable statutes of limitation, and that all are without merit. The court first examines the time limitation on each of Goldman's claims.

Goldman first contends that he was denied promotions to the position of sergeant. Specifically, Goldman has listed the following promotions and their dates:

(1)     promotion of Donald Bradley on January 4, 2001;
(2)     promotion of Christopher Essman on September 25, 2003;
(3)     promotion of Steve Gamble on September 9, 2004;
(4)     promotion of Mark Didcoct on August 25, 2005;
(5)     promotion of Richard Riley on January 26, 2006;
(6)     promotion of Christopher Taylor on February 22, 2007; and
(7)     promotion of Brent Rankin on December 27, 2007.

Defendant asserts that most of these claims are barred by the statutes of limitation applicable to claims under Title VII and § 1983.  The defendant sets forth the applicable statutes of limitation

governing plaintiff's claims of discrimination, and plaintiff has not disputed the defendant's analysis of the timebar.

In order to pursue a claim under Title VII, an employee is required to file an EEOC charge of discrimination within 180 days of the alleged adverse employment action.  42 U.S.C. § 2000e-5(e)(1).  The EEOC charge of discrimination filed by Goldman and relevant to this case was filed on March 6, 2006.[11]  Accordingly, the only promotion claims that may be brought under Title VII are those that occurred within 180 days prior to March 6, 2006, which means that any claim arising before September 7, 2005, is time-barred.  Thus, the promotions of Bradley, Essman, Gamble, and Didcoct cannot now be made the basis of Title VII relief for the plaintiff.

Plaintiff contends that his claims of discrimination also are cognizable under §§ 1981 and 1983.  Generally, the statute of limitation for claims under either statute is two years.[12]  Because the lawsuit was filed on October 17, 2007, applying that two-year statute would result in any promotions occurring prior to October 17, 2005, being time-barred.  In this case, whether the claims are viewed as claims under Title VII or claims under § 1981 or § 1983 is irrelevant for limitation purposes

---

[11]     Although Goldman filed a separate EEOC claim in 2003, he did not pursue those claims further, and any right to sue on those claims was extinguished before the instant complaint was filed.

[12]     Whether the two-year statute applies to a claim generally depends upon whether the cause of action could have been brought prior to the enactment of the Civil Rights Act of 1991, which amended § 1981.  It is undisputed that plaintiff's claims that he was denied promotions based on race were cognizable prior to the 1991 act and that the two-year statute of limitation applies to plaintiff's promotion claims.  Defendants argue that the training claims, which would be subject to the four-year statute of limitation, are barred because plaintiff has failed to identify when any of the denials of training opportunities occurred.  The facts show that at least one of these claims – that he was denied a firearms training program in August or September 2003 – is sufficiently identified but, because it occurred more than four years before the complaint was filed in October 2007, is time-barred.

because there were no promotions granted during the time span between the EEOC 180-day deadline and the two-year deadline.  As a result, no claim arising from any promotion decision made prior to September 8, 2005, is viable under Title VII, § 1981, or § 1983.[13]  Applying this principle to the instant acts of promotion which plaintiff claims are discriminatory, plaintiff is barred from seeking redress for the promotions of Bradley, Essman, Gamble, and Didcoct because those claims are time-barred.  Accordingly, the only race-based claims asserted by plaintiff relating to the promotions to sergeant that are not time-barred are the promotions of Riley on January 26, 2006, of Taylor on February 22, 2007, and of Rankin on December 27, 2007.[14]  Only these instances of promotions denied to plaintiff can form bases for either Title VII or § 1981 relief.

---

[13]    To the extent that the plaintiff asserts failure-to-promote claims under USERRA, the relevant time limitation is discussed *infra*.

[14]    Both Taylor's and Rankin's promotions occurred after plaintiff filed his EEOC charge on March 6, 2006, and Rankin's promotion occurred after the lawsuit was filed.  Hueytown also advances the argument that any claim regarding an alleged discriminatory failure to promote at the time of Rankin's promotion should be dismissed because it is neither pleaded in the complaint, nor did plaintiff file an EEOC charge of discrimination with respect to the denial of that particular promotion.  While the failure to file a new EEOC charge might preclude a Title VII claim, plaintiff also has pleaded a parallel and indistinguishable § 1981 claim, which is not barred by the failure to file an EEOC charge.  The court also is persuaded that the complaint adequately incorporates a § 1981 claim for failure to promote at the time of the Rankin promotion.  Plaintiff alleges that "he has been denied the position of Sargent [*sic*] each and every time he has applied," and that he will "continue to suffer irreparable injury" from the allegedly discriminatory employment practices of the defendant.  These allegations are enough to allege that promotion denials occurring after the filing of the complaint were discriminatory also.  Although it is true that plaintiff never specifies the Rankin promotion as a discriminatory event, he never specifies *any* particular promotion as discriminatory, alleging, in essence, that "each and every" one of the promotions he did not get was discriminatory.  It was not necessary to amend the complaint to specify the Rankin promotion as another discriminatory denial of promotion to the sergeant position.

18

B.  Law Governing Race-Based Claims Of Discriminatory Promotions

Title VII prohibits discrimination with respect to an employee's "compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a).  Specifically, the statute provides that it shall be unlawful for an employer:

> to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a)(1).  Plaintiff also asserts race discrimination claims pursuant to 42 U. S. C. § 1981, which provides that "all citizens shall have the same right to 'make and enforce contracts.'" See Brown v. American Honda Motor Co., 939 F.2d 946, 949 (11th Cir. 1991).  Section 1981 claims against public employers are enforced through an action under § 1983.  Finally, Goldman also alleges that he was subjected to racial discrimination in violation of the Equal Protection Clause, and seeks relief pursuant to 42 U.S.C. § 1983 against Mayor Baumann and Chief MeBee.[15]  Racial discrimination claims are analyzed under the same framework, whether brought under Title VII, § 1981, or § 1983.  See Abel v. Dubberly, 210 F.3d 1334, 1338 (11th Cir. 2000) (holding that Title VII and § 1983 claims have the same elements where the claims are based on the same set of facts); Stallworth v. Shuler, 777 F.2d 1431, 1433 (11th Cir.1985) (stating that "[w]here, as here, a plaintiff

---

[15]    It appears from the complaint that the Equal Protection clause claim, asserted through an action under § 1983, is alleged only against Baumann and McBee in count four, not against Hueytown.

19

predicates liability under Title VII on disparate treatment and also claims liability under sections

1981 and 1983, the legal elements of the claims are identical ... [and] we need not discuss plaintiff's

Title VII claims separately from his section 1981 and section 1983 claims."); Turnes v. AmSouth

Bank, 36 F.3d 1057, 1060 (11th Cir. 1994)(The McDonnell Douglas analysis that is used to prove

race discrimination under Title VII also is the appropriate model to evaluate Section 1981 claims.).[16]

1. *Discriminatory Failure-to-Promote Claims*

A plaintiff may prove a *prima facie* case of discriminatory denial of a promotion by

establishing the following: (1) that he is a member of a protected class; (2) that he was qualified for

the promotion; (3) that he was rejected despite his qualifications; and (4) that the position was filled

---

[16]    Hueytown seeks to avoid liability on any claim brought pursuant to § 1983 by asserting that plaintiff has failed to identify a policy or custom of Hueytown that caused the plaintiff's injury as required by Monell v. New York City Dep't. of Social Services, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).  While it is true that municipalities may be liable under § 1983 for the deprivation of a constitutional right caused by the action of a city agency only when the act was performed pursuant to a custom or policy, a longstanding tradition followed by a decisionmaker acting on behalf of a city can subject the municipality to liability where the "relevant practice is so widespread as to have the force of law."  436 U.S. at 690-91.  In this case, the city does not dispute that it hired only two African American police officers over many years, and never promoted either of them.  The facts alleged by plaintiff could lead a reasonable factfinder to conclude that the hiring decisions at issue were routinely made by the police chief, who essentially hand-picked the employees for promotion, and that the choices were then "rubber-stamped" by the mayor.  In such instances, the mayor is the "final policymaker" with respect to promotion and employment decisions for the City, so that his acts are legally those of the City itself.  See, e.g., Templeton v. Bessemer Water Service, 154 Fed. Appx. 759 (11th Cir. 2005); Pembaur v. Cincinnati, 475 U.S. 469, 106 S. Ct. 1292, 89 L. Ed. 2d 452 (1986); City of St. Louis v. Praprotnik, 485 U.S. 112, 108 S. Ct. 915, 99 L. Ed. 2d 107 (1988).  As the city's "final policy maker" with respect to the employment decisions, the mayor's decision effectively is the city's decision.  Accordingly, the motion for summary judgment on the basis that the city cannot be liable for the § 1983 claims is due to be denied.  As discussed *supra*, however, the plaintiff's same claims of race discrimination are viable under Title VII.

20

with an individual outside the protected class.  <u>Vessels v. Atlanta Independent School System</u>, 408

F.3d 763, 768 (11th Cir. 2005);  <u>Alexander v. Fulton County, Ga.</u>, 207 F.3d 1303, 1339 (11th Cir.

2000).[17]  A disparate treatment claim requires proof of discriminatory intent, either through the use

of direct or circumstantial evidence.  <u>See, e.g.</u>, <u>Equal Employment Opportunity Commission v. Joe's</u>

<u>Stone Crab, Inc.</u>, 220 F.3d 1263, 1286 (11th Cir. 2000).  Claims under both the Equal Protection

clause and Title VII require a showing of "purposeful" discrimination.

In order to establish a *prima facie* case of race discrimination, a plaintiff may present to the

court: (1) direct evidence that "discriminatory animus played a significant or substantial role in the

employment decision," <u>Eskra v. Provident Life and Accident Ins. Co.</u>, 125 F.3d 1406, 1411 (11th

Cir. 1997), or (2) circumstantial evidence of discrimination, in accordance with the four-part test set

forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973),

or (3) statistical evidence of a "pattern and practice" of discrimination.  <u>Zaben</u>, 129 F.3d at 1457.

Direct evidence is evidence that establishes the existence of discriminatory intent behind the

employment decision without requiring the factfinder to make any inferences or presumptions.

<u>Carter v. City of Miami</u>, 870 F.2d 578, 580-81 (11th Cir. 1989).  Where there is no direct evidence,

the plaintiff must prove intent through circumstantial evidence in accordance with  <u>McDonnell</u>

<u>Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).  When the plaintiff

relies upon circumstantial evidence, rather than direct evidence, he creates a presumption of

---

[17]      A *prima facie* showing does not require plaintiff to show that he was more qualified
than the persons promoted, although the qualifications of the sergeants who received the promotions
may be relevant to rebuttal of the defendant's non-discriminatory reason.  <u>Vessels</u>, 408 F.3d at 769.

discrimination by establishing a *prima facie* case. The presumption may be rebutted, however, if the employer offers a legitimate, nondiscriminatory reason for the employment action. The Eleventh Circuit Court of Appeals has noted that the burden of production required of the defendant in articulating a nondiscriminatory reason is "exceedingly light." Perryman v. Johnson Products Co., Inc., 698 F.2d 1138, 1142 (11th Cir.1983). Nevertheless, the defendant's explanation must be clear and reasonably specific, and some proffered reasons may be deemed legally insufficient to rebut a *prima facie* showing. Conner v. Fort Gordon Bus Co., 761 F.2d 1495, 1499 (11th Cir. 1985).

Once the nondiscriminatory reason is adequately articulated, the burden shifts to the plaintiff to show that the reason is either not worthy of belief, or that, in light of all the evidence, a discriminatory reason more likely motivated the decision than the preferred reason. Standard v. A.B.E.L. Servs. Inc., 161 F.3d 1318, 1331-33 (11th Cir. 1998), reh'g and reh'g *en banc* denied, 172 F.2d 884 (11th Cir. 1999), citing Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997), cert. denied, 522 U.S. 1045, 118 S. Ct. 685, 139 L. Ed. 2d 632 (1998). Pretext may be demonstrated where the plaintiff shows "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." Combs v. Plantation Patterns, 106 F.3d at 1538.

In each of these cases it is uncontested that Goldman had passed the sergeant's exam and that his name appeared on the list of eligibles from which Hueytown was allowed to choose in promoting a candidate to sergeant in accordance with the rules of the Jefferson County Personnel Board. It is further uncontested that Goldman was qualified for the post and that in each instance the promotion was given to a Caucasian. The defendant does not dispute that the elements of a *prima facie* claim

of racial discrimination have been met in this case.  Because it is undisputed that the plaintiff has met his burden of setting forth a *prima facie* case, the court next looks to the defendant's articulated nondiscriminatory reason for the decisions to promote Riley, Taylor, and Rankin instead of Goldman.  In the cases of Riley and Taylor, the defendant has stated that both officers never received a score of less than "meets expectations," had received scores of "commendable" on some or most evaluations, and had no disciplinary actions taken against them at Hueytown.  In the case of Rankin, the defendant asserts that Rankin also had better scores on evaluations than Goldman, and had only one disciplinary action against him, and that one was the incident involving Goldman in which Goldman was adjudged the initial aggressor.

The question of whether defendant Hueytown is entitled to summary adjudication of plaintiff's remaining discrimination claims arising from promotions to the position of sergeant turns upon whether the plaintiff has demonstrated that the articulated, non-discriminatory reason for the promotion that has been provided by the defendant in litigation is merely pretextual. Where the employer uses subjective rather than objective assessments in making employment decisions, the likelihood of discrimination is increased.  Lee v. Conecuh County Bd. of Educ., 634 F.2d 959, 963 (5th  Cir. Jan. 22, 1981).[18]

In Lee, a black male teacher alleged racial discrimination because the defendant school board repeatedly failed to promote him to principal.  The appellate court determined that the board based its decision on subjective evaluations of the plaintiff's teaching ability, and that it relied on the

---

[18]    In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc*), the Eleventh Circuit Court of Appeals adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

evaluations of a single supervisor, noting: "Establishing qualifications is an employer's prerogative ... but an employer may not utilize wholly subjective standards by which to judge its employees' qualifications and then plead lack of qualification when its promotion process, for example, is challenged as discriminatory." Lee, 634 F.2d at 963 (citing Rowe v. General Motors Corp., 457 F.2d 348, 358 (5th Cir.1972)).  Moreover, where the method of assessing qualifications changes "in the twinkling of an eye," and without explanation, those reasons are more highly suspect.  See, *e.g.*, Conner v. Fort Gordon Bus Co., 761 F.2d at 1502 (J. Hatchett, dissenting).

An employer's articulated reason may be "unworthy of credence" where the evidence allows an inference that the employer is shown to be dishonest by giving "shifting reasons."  Cleveland v. Home Shopping Network, Inc., 369 F.3d 1189, 1194-95 (11th Cir. 2004).  Once an employer's articulated reason has been eliminated, it becomes more likely than not that the employer "who we generally assume acts with some reason, based his decision on an impermissible consideration." Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577, 98 S. Ct. 2943, 57 L. Ed. 2d 957 (1978). Accordingly, a *prima facie* showing, combined with evidence that is sufficient to permit a finding that the employer's asserted reason is false, permits a jury to conclude that the reason for the employment decision was unlawful discrimination.   Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 148, 120 S. Ct. 2097 (2000).

In its brief in support of motion for summary judgment, Hueytown argues that it was "not unreasonable" to promote Riley instead of Goldman.  The defendant argues that Riley had no history of discipline with the City of Hueytown and that Riley had never received a rating below "meets expectations" on any of his job evaluations.  The defendant further points out that Riley received

24

ratings of "commendable" on several evaluations before he was promoted.  The plaintiff asserts that these reasons are mere pretext.

Goldman contends that Hueytown's excuse that his record of discipline was the reason Hueytown chose Riley over Goldman is pretextual and unworthy of credence.  Plaintiff's position is based upon a series of interwoven facts.  First, the mayor contends that all qualified candidates, which consists of all persons whose names appear on the certificate of eligibles, should be interviewed for each open position.  Yet it is clear from the record that on most occasions the only interview granted was to the officer who ultimately received the promotion.  From this, a reasonable jury might infer that the police chief "hand picked" officers for promotion, and then interviewed only the officer the chief wanted to promote.  Goldman was never interviewed for any of the sergeant positions.[19]  Further, while Hueytown now asserts that the reason Goldman was never promoted was because of his disciplinary involved with the dispute with Officer Rankin and the 2000 incident at UAB, Goldman was never told that those incidents were in any way detrimental to his promotion.  To the contrary, when Goldman inquired, he was told that promotions were based or seniority.  Once Goldman attained a level of seniority sufficient for promotion, Hueytown took the position that promotions were a result not solely of seniority but also of performance.  Finally, while Hueytown now contends that the UAB incidents were severely detrimental to Goldman's performance, the UAB incidents were never reflected in his performance evaluation, and he was never told — until

---

[19]     While the court notes that several of these promotions are time-barred as bases for legal relief, the facts surrounding the promotion process still are relevant evidence with respect to the claims that are not time-barred as they tend to show that the promotion process was not objective, but simply the subjective choice of the police chief.

this litigation — that any performance issues had caused him to be passed over for promotion.[20]
Accordingly, Hueytown's reasons "shifted," in a short time, if not in a "twinkling of an eye."

Even more troubling is the fact that the discipline and lukewarm evaluations which allegedly rendered Goldman unsuitable for promotion were subjective, and were imposed single-handedly by McBee, who is alleged to be acting with discriminatory motives in making the promotion decisions at issue.  It is well settled that an employer cannot engage in discriminatory practices in imposing discipline, then use those disciplinary actions as reasons for denying promotions or raises or other employment benefits.   It becomes even more suspect when another officer with a record of disciplinary action is promoted.[21]

---

[20]	McBee's assertion that any disciplinary action would render an officer unworthy of promotion is wholly incredible given McBee's own tarnished record as a police officer with the City of Birmingham.  His own disciplinary history includes running criminal checks as a "side job" without permission and in violation of guidelines, submitting false information by seeking overtime pay for time in court when he was not in court, and two citations for driving city vehicles while intoxicated.  He was found guilty of conduct unbecoming an employee in the public service, and of intoxication while on duty.  He was demoted and received multiple suspensions while working for Birmingham.  (See McBee Depo., pp. 37-60, Defendant's Joint Evidentiary Submission, Ex. 4). Despite this checkered history, McBee was selected to be Hueytown's police chief.  Furthermore, the promotion of Rankin to sergeant completely undermines the credibility of the assertion, as Rankin himself had disciplinary issues arising from the same incident as the plaintiff's.

[21]	Defendants defend the promotion of Rankin on the "difference" between Goldman's infraction as the "aggressor," and Rankin's infraction as one of reaction.  In this case, however, the differentiation between the two officers' conduct was based on witness reports in which the police chief, alleged to be the discriminating decisionmaker, apparently chose to believe the accounts of the Caucasian officers, while discounting the accounts of the African American officers.  It is important to note that, although McBee concluded that plaintiff was the initial aggressor in the confrontation with Rankin, nothing in the evidence disputes the eye witness testimony that Rankin drew his baton and even threatened to draw his weapon during the confrontation.  Whether or not plaintiff was the initial aggressor, Rankin's resort to weapons certainly aggravated and escalated the confrontation as culpably as plaintiff's initial aggression.

Finally, while this case is not one alleging a racially hostile work environment as a claim, plaintiff has offered evidence of potentially racially hostile acts and Hueytown's failure to take steps the punish or deter them.  The general failure of the police chief to respond to allegations of racially hostile acts can be viewed as relevant to his subjective motivation in the promotion context as well. A reasonable inference might be drawn that, where the police chief fails to punish or prevent racially hostile acts, he likely is not keen to promote a black officer to sergeant.  Viewing the facts in the light most favorable to the plaintiff, a reasonable factfinder could conclude that the defendants' articulated reasons for failing to promote Goldman are not worthy of belief and that race discrimination was the real reason Goldman was never promoted.  Accordingly, Hueytown's motion for summary judgment on the timely-filed failure-to-promote claims is due to be denied.

2. *Discriminatory Failure-to-Train Claims*

Although Hueytown seeks summary judgment on all of plaintiff's claims, it's brief did not address plaintiff's discriminatory failure-to-train claims, focusing instead on plaintiff's discriminatory failure-to-promote claims.  Because Hueytown has not carried its initial summary judgment burden of showing its entitled to judgment as a matter of law on the failure-to-train claims, summary judgment must be denied on them.  Because defendant has not challenged these claims, the court has no reason to address (and expresses no opinion on) whether these claims of discriminatory failure to train can adequately support a basis for relief under either Title VII or § 1981.  Accordingly, the motion for summary judgment as to any claims regarding training opportunities is due to be denied.

27

C.  Retaliation Claims Against the City Of Hueytown

Goldman contends that the City, as his employer, retaliated against him because he complained of race discrimination.  The actions he contends were retaliatory include failing to provide backup when on duty and failing to promote or provide training.  Defendants challenge the retaliation claims as insubstantial and time-barred.  Defendants further assert that the plaintiff has conceded that none of the promotions he was denied was denied due to any retaliatory animus.

The Supreme Court has noted that Title VII provides a broader definition of retaliatory conduct than discriminatory conduct.  In Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 126 S. Ct. 2405 (2006), the Court explained:

> The language of the substantive provision differs from that of the anti-retaliation provision in important ways. Section 703(a) sets forth Title VII's core anti-discrimination provision in the following terms:
>
> > "It shall be an unlawful employment practice for an employer-
> >
> > "(1) to *fail or refuse to hire or to discharge* any individual, or otherwise to discriminate against any individual *with respect to his compensation, terms, conditions, or privileges of employment*, because of such individual's race, color, religion, sex, or national origin; or
> >
> > "(2) to limit, segregate, or classify his employees or applicants for employment in any way *which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee*, because of such individual's race, color, religion, sex, or national origin." § 2000e-2(a) (emphasis added).
>
> Section 704(a) sets forth Title VII's anti-retaliation provision in the following terms:
>
> > "It shall be an unlawful employment practice for an employer *to discriminate against* any of his employees or applicants for

28

employment ... because he has opposed any practice made an
unlawful employment practice by this subchapter, or because he has
made a charge, testified, assisted, or participated in any manner in an
investigation, proceeding, or hearing under this subchapter."
§ 2000e-3(a) (emphasis added).

The underscored words in the substantive provision — "hire," "discharge,"
"compensation, terms, conditions, or privileges of employment," "employment
opportunities," and "status as an employee" — explicitly limit the scope of that
provision to actions that affect employment or alter the conditions of the workplace.
No such limiting words appear in the anti-retaliation provision.  Given these
linguistic differences, the question here is not whether identical or similar words
should be read *in pari materia* to mean the same thing.  See, *e.g.*, *Pasquantino v.
United States*, 544 U.S. 349, 355, n. 2, 125 S. Ct. 1766, 161 L. Ed. 2d 619 (2005);
McFarland v. Scott, 512 U.S. 849, 858, 114 S. Ct. 2568, 129 L. Ed. 2d 666 (1994);
Sullivan v. Everhart, 494 U.S. 83, 92, 110 S. Ct. 960, 108 L. Ed. 2d 72 (1990).
Rather, the question is whether Congress intended its different words to make a legal
difference.  We normally presume that, where words differ as they differ here,
"'Congress acts intentionally and purposely in the disparate inclusion or exclusion.'"
*Russello v. United States*, 464 U.S. 16, 23, 104 S. Ct. 296, 78 L. Ed. 2d 17 (1983).

There is strong reason to believe that Congress intended the differences that its
language suggests, for the two provisions differ not only in language but in purpose
as well. The anti-discrimination provision seeks a workplace where individuals are
not discriminated against because of their racial, ethnic, religious, or gender-based
status. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800-801, 93 S. Ct.
1817, 36 L. Ed. 2d 668 (1973).  The anti-retaliation provision seeks to secure that
primary objective by preventing an employer from interfering (through retaliation)
with an employee's efforts to secure or advance enforcement of the Act's basic
guarantees.  The substantive provision seeks to prevent injury to individuals based
on who they are, *i.e.*, their status.  The anti-retaliation provision seeks to prevent
harm to individuals based on what they do, *i.e.*, their conduct.

To secure the first objective, Congress did not need to prohibit anything other than
employment-related discrimination.  The substantive provision's basic objective of
"equality of employment opportunities" and the elimination of practices that tend to
bring about "stratified job environments," *id.*, at 800, 93 S. Ct. 1817, would be
achieved were all employment-related discrimination miraculously eliminated.

But one cannot secure the second objective by focusing only upon employer actions
and harm that concern employment and the workplace.  Were all such actions and

29

harms eliminated, the anti-retaliation provision's objective would not be achieved. An employer can effectively retaliate against an employee by taking actions not directly related to his employment or by causing him harm outside the workplace. *See, e.g., Rochon v. Gonzales*, 438 F.3d, at 1213 (FBI retaliation against employee "took the form of the FBI's refusal, contrary to policy, to investigate death threats a federal prisoner made against [the agent] and his wife"); *Berry v. Stevinson Chevrolet*, 74 F.3d 980, 984, 986 (C.A.10 1996) (finding actionable retaliation where employer filed false criminal charges against former employee who complained about discrimination). A provision limited to employment-related actions would not deter the many forms that effective retaliation can take. Hence, such a limited construction would fail to fully achieve the anti-retaliation provision's "primary purpose," namely, "[m]aintaining unfettered access to statutory remedial mechanisms." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346, 117 S. Ct. 843, 136 L. Ed. 2d 808 (1997).

548 U.S. at 61-66.

Burlington instructs that the anti-retaliation provision protects an employee from retaliation which "a reasonable employee would have found 'materially adverse,'" which means that the retaliatory conduct would "dissuade[] a reasonable employee from making or supporting a charge of discrimination." 548 U.S. at 68. The applicable standard is meant to "screen out trivial conduct" but still "capturing" the retaliation that may prevent employees from complaining of discrimination. 548 U.S. at 70.

Applying the standard enunciated in Burlington to the facts alleged by Goldman, the plaintiff has presented evidence that at least some of the defendants' actions may constitute actionable retaliatory conduct. It is for a jury to decide whether "anything more than the most petty and trivial actions against an employee should be considered 'materially adverse'" to him and thus constitute adverse employment actions." Crawford v. Carroll, 529 F.3d 961, 974 n. 13 (11th Cir. 2008). Forcing the plaintiff to rewrite police reports is not sufficiently adverse to dissuade a reasonable

30

employee from complaining of discrimination and must be deemed petty or trivial; however, failing to promote Goldman to the position given to Rankin certainly constitutes an action sufficiently adverse.  Similarly, the failure to provide backup — an action which could be perceived by any reasonable police officer as placing him in a dangerous position — also may constitute actionable conduct.[22]  See, e.g., Rochon v. Gonzales, 438 F.3d 1211 (D.C. Cir. 2006)(finding that FBI's refusal to investigate death threats made against African-American agent, when such investigation was standard procedure, was cognizable as retaliatory actions because a reasonable FBI agent may have been dissuaded from engaging in protected activity).  The court agrees with defendants, however, that any claims of retaliation based upon conduct that occurred prior to the time period encompassed by the 2006 EEOC charge is time-barred.[23]  To the extent plaintiff offers proof of instances of retaliation after September 7, 2005, the motion will be denied.

The defendants further assert that plaintiff has conceded that the promotions were not retaliatory.  The deposition testimony cited for this proposition, however, is at best ambiguous.

---

[22]    The court acknowledges that Hueytown might well be able to argue that the failure to provide backup was unknown to the city, something that fellow officers failed to do, while not any official policy or act of the city.  There are sufficient fact disputes to warrant a trial, at which the city may argue that it was unaware of this problem and did not approve or participate in it.

[23]    To the extent that plaintiff complains he was retaliated against prior to 2006 for having filed his 2003 EEOC charge or for other complaints or letters, he failed to timely assert any claim that arose prior to September 7, 2005.  Once a right-to-sue letter was issued on the 2003 charge, plaintiff had 90 days in which to commence suit.  When he failed to do so, discriminatory actions and claims covered by the 2003 charge, including retaliation that arose from it (and which was not covered in a separate charge of discrimination), expired.  The court further agrees with defendants that each denial of a training opportunity or a promotion constitutes a "discrete" act and must be encompassed within a timely-filed EEOC charge.  National R.R. Passenger Corp., 536 U.S. at 113.  The only claims that ultimately can survive a timeliness argument (either here or in response to a Rule 50 motion) are those arising on September 7, 2005, or later.

31

Plaintiff asserted that he was retaliated against because he "can't get promoted," although he further stated that he did not believe the promotions were retaliatory.  Finally, defendants argue that the alleged retaliatory promotion is not causally related to the protected activity because it is not close in time to the complaint, coming a year and 10 months after the filing of the EEOC charge.  While the timing alone is insufficient to trigger a determination of causation, the argument is without basis where the circumstances viewed as a whole support a claim of retaliation.  Plaintiff has offered evidence that superior officers in the Hueytown police department told him that certain actions were taken because he had filed a charge of discrimination.  This evidence helps establish causation over and above the evidence of mere temporal proximity.  Plaintiff here is not relying *solely* on temporal proximity to establish the element of causation.  Accordingly, the motion for summary judgment as to plaintiff's claims that Hueytown engaged in retaliatory conduct by failing to promote him in 2007 and in failing to provide police backup is due to be denied.

       D.  USERRA Claims Against the City of Hueytown

      Plaintiff's claims that he was subjected to discrimination on the basis of his military service are supported by the alleged comments made by Joe Williams, a lieutenant in the Hueytown Police Department, and by defendant McBee.  Goldman asserts that Williams told him that, if city officials had known he was a member of the Army Reserves, he would not have been hired.  McBee later allegedly told Goldman that he didn't think Goldman would be available for work because of his military commitments.   Defendant Hueytown seeks dismissal of the USERRA claims only on the

ground that any claim arising prior to October 15, 2003, is time-barred.[24]  Plaintiff argues that no statute of limitation applies to USERRA claims.

There is no dispute that, at the time of the filing of the complaint in this action, the provisions of the USERRA did not contain any express limitations period governing the filing of a claim for relief.  Section 4323(i) expressly prohibited the application of any State statute of limitation, but it said nothing about the federal "catch-all" limitation at 28 U.S.C. § 1658.  Effective October 10, 2008, Congress amended USERRA by adding a new statutory provision, § 4327, which provided in relevant part:

> If any person seeks to file a complaint or claim with the Secretary [of Labor], the Merit Systems Protection Board, or a Federal or State court under this chapter alleging a violation of this chapter, there shall be no limit on the period for filing the complaint or claim.

38 U.S.C. § 4327(b).  As of October 10, 2008, therefore, Congress made plain that no limitation period applied to USERRA claims.  The enactment of this provision, however, prompts several questions: Does it apply retroactively to claims already pending?  If the federal "catch-all" statute, § 1658, did apply to USERRA claims before the effective date of the amendment, does this provision revive those claims that are otherwise time-barred under § 1658?  Is this provision a mere

---

[24]     Hueytown further asserts that the USERRA claim is time-barred because Williams' comment was made in 2000, prior to the asserted four-year cutoff.  This argument conflates the notion of direct evidence – which is what Williams' alleged comment is – with a discriminatory act.  Because plaintiff has produced direct evidence of discrimination, any motion to dismiss the claim on substantive grounds also is due to be denied.  See, e.g., Coffman v. Chugach Support Services, Inc., 411 F.3d 1231 (11th Cir. 2005)(plaintiff must show by a preponderance of the evidence that his military service was one of the factors in the employer's decision).

clarification of Congress's intent that USERRA was never intended to be subject to any limitation period?

The best exploration of these questions is found in a very recent Seventh Circuit Court of Appeals case, Middleton v. City of Chicago, ___ F.3d ___, 2009 WL 2581440 (7th Cir., Aug. 24, 2009), in which the court held (1) that the four-year limitation provided in § 1658 did apply to USERRA claims prior to October 10, 2008; (2) that the newly-added § 4327(b) does not apply retroactively; and (3) § 4327(b) cannot revive claims that were already time-barred under § 1658 on October 10, 2008, when the new provision became effective.  Addressing first the question of the applicability of the "catch-all" limitation statute, § 1658, the Seventh Circuit reasoned, "Simply applying the language of § 1658(a) to USERRA indicates that the latter was subject to the former: this is a civil action; USERRA is an act of Congress; it was enacted well after § 1658(a); and it did not 'otherwise provide' for a different limitations period." Middleton, 2009 WL 2581440 at *2.  In so holding, the court of appeals rejected the argument that USERRA is merely an amendment of the pre-existing Veterans' Reemployment Rights Act of 1974 (VRRA), 38 U.S.C. § 2021 et seq. (recodified at 38 U.S.C. § 4301 et seq. by the Veterans' Benefits Act of 1992, Pub.L. No. 102-568, § 506, 106 Stat. 4320, 4340, amended by USERRA.)  Citing Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 377-80, 124 S. Ct. 1836, 158 L. Ed. 2d 645 (2004), the Seventh Circuit reasoned that

> the Supreme Court held that "a cause of action 'aris[es] under an Act of Congress enacted' after December 1, 1990 — and therefore is governed by § 1658's 4-year statute of limitations — if the plaintiff's claim against the defendant was made possible by a post-1990 enactment." 541 U.S. at 382 (alteration in original).  This principle governs even if the new law amended a preexisting law; Congress often creates new causes of action by amending existing statutes, and § 1658(a) is not limited "to entirely new sections of the United States Code." Id. at 381.  "What

matters is the substantive effect of an enactment — the creation of new rights of action and corresponding liabilities — not the format in which it appears in the Code." Id.  As the Court directed, we must determine "whether the plaintiff has alleged a violation of the relevant statute as it stood prior to December 1, 1990, or whether her claims necessarily depend on a subsequent amendment." Id. at 384.

Id. at *3.  Noting that the VRRA provided only equitable relief, the court then compared USERRA,

finding that it created new rights to sue for money damages and for a jury trial.  The court wrote:

> In 1994, Congress replaced the VRRA with USERRA "to clarify, simplify, and, where necessary, *strengthen* the existing veterans' employment and reemployment rights provisions."  H. R. Rep. No. 103-65(I), at 18 (1993) (emphasis added), as reprinted in 1994 U.S.C.C.A.N. 2449, 2451; see also S. Rep. No. 103-158, at 33 (1993) (noting that USERRA "would restructure, clarify, and improve " the VRRA (emphasis added)).  Among other improvements, if an employer engaged in willful discrimination, USERRA permitted a plaintiff to seek liquidated damages, a form of relief unavailable under the VRRA.  See USERRA sec. 2, § 4324(c)(1)(A)(iii).  With that new provision, Congress converted what had been an equitable claim into a legal one, which brought along the corresponding right to a jury trial.  See Maher v. City of Chi., 463 F. Supp. 2d 837, 844 (N.D. Ill. 2006) (holding that liquidated damages under USERRA are punitive and therefore subject to trial by jury); cf. Calderon v. Witvoet, 999 F.2d 1101, 1109 (7th Cir. 1993) (holding that actions seeking liquidated damages under a different statute are "suits at common law" for purposes of the Seventh Amendment's right to a jury trial); Troy v. City of Hampton, 756 F.2d 1000, 1003 (4th Cir. 1985) (holding that claims under the VRRA are equitable and a plaintiff is not entitled to a jury trial).  Consequently, USERRA established additional rights and liabilities that did not exist under the VRRA.

Id. at *3 (italics in original).

The court also noted that USERRA was enacted only four years after Congress created the

catch-all limitation provision in § 1658, and if Congress had intended USERRA not to be subject

to § 1658, it could have said so explicitly, as it did with the October 10, 2008, amendment.  The

court explained as follows:

> [W]e are charged with interpreting the laws that Congress enacts based on the language that it uses. Congress enacted USERRA well after it created the four-year limitations period in § 1658, and we presume that Congress knew that any new federal statute would be subject to such a limitation unless it "otherwise provided by law." Thus, if Congress wanted a different limitations period to apply to USERRA— or none at all — it needed to say so. And this is precisely what Congress did in 2008, when it passed the Veterans' Benefits Improvement Act ...."

Id. at *5.

Next, the court rejected the argument that the October 10, 2008, amendment of USERRA contained in the Veterans' Benefits Improvement Act ("VBIA") applies retroactively to revive claims already time-barred under § 1658. First observing that nothing in the VBIA spoke to the issue of retroactivity, the court pointed out that the language of the amendment itself — "[i]f any person *seeks to file* a complaint or claim ...." — seems to apply only prospectively, that is, to those claims that a person "seeks to file" after the effective date of the act. Typically, statutes that seek to enlarge the time within which a claim can be made are construed to apply only prospectively to avoid the very problem of reviving stale, time-barred claims.

Lastly, the Middleton court rejected the argument that the amendment enacted in VBIA was simply a clarification of Congressional intent existing all along that USERRA was not subject to the § 1658 limitation provision. The court reasoned:

> Middleton argues that the VBIA merely clarified, rather than altered, existing law. Such legislation is not typically subject to a presumption against retroactivity and is applied to all cases pending on the date of enactment. See, e.g., ABKCO Music, Inc. v. LaVere, 217 F.3d 684, 689 (9th Cir. 2000) ("Normally, when an amendment is deemed clarifying rather than substantive, it is applied retroactively." (quotations omitted)); Piamba Cortes v. Am. Airlines, Inc., 177 F.3d 1272, 1283 (11th Cir. 1999) ("[C]oncerns about retroactive application are not implicated when an amendment

36

... is deemed to clarify relevant law rather than effect a substantive change in the law."); cf. Clay v. Johnson, 264 F.3d 744, 749 (7ᵗʰ Cir. 2001) (noting that an agency rule clarifying an unsettled area of law may be applied to case at hand). A number of factors may indicate whether an amendment is clarifying rather than substantive: whether the enacting body declared that it was clarifying a prior enactment; whether a conflict or ambiguity existed prior to the amendment; and whether the amendment is consistent with a reasonable interpretation of the prior enactment and its legislative history. Piamba Cortes, 177 F.3d at 1283-84; see also Liquilux Gas Corp. v. Martin Gas Sales, 979 F.2d 887, 890 (1ˢᵗ Cir. 1992).

We disagree with Middleton that the VBIA was clarifying legislation. As we explained in the first portion of our opinion, § 1658 applied to USERRA, and the text of the two statutes was not ambiguous, leaving nothing for Congress to "clarify." Nor is the VBIA's amendment a reasonable interpretation of USERRA, which was silent on whether § 1658 should apply, or its legislative history, which contained nothing to contradict the clear language of § 1658. Rather than "clarifying" that no statute of limitations applied to USERRA, the 2008 Congress substantively changed the law so that § 1658 would not apply.

Id. at *7-8.

In the end, the Middleton decision found that USERRA claims were subject to the limitation period in § 1658 until Congress expressly removed all limitations on October 10, 2008. Nonetheless, USERRA claims time barred by operation of § 1658 prior to the enactment of § 4327(b) could not be retroactively revived by the new statute. Before the enactment of § 4327(b), other courts also concluded that USERRA claims are subject to the "catch-all" limitation. See Hogan v. United Parcel Service, ___ F. Supp. 2d ___, 2009 WL 2058803 (W.D. Mo., July 13, 2009); Potts v. Howard University Hosp., 623 F. Supp. 2d 68, (D.D.C., June 10, 2009); Wagner v. Novartis Pharmaceuticals Corp., 565 F. Supp. 2d 940 (E.D.Tenn. 2008); Aull v. McKeon-Grano Associates, Inc., 2007 WL 655484, at *4 (D.N.J. Feb. 26, 2007); O'Neil v. Putnam Retail Management LLP, 407 F. Supp. 2d

37

310, 316 (D. Mass. 2005); Nino v. Haynes International, Inc., 2005 WL 4889258, at *5-6 (S.D. Ind. Aug. 19, 2005).

For this reason, this court also finds that USERRA claims were subject to the § 1658 limitation period prior to the enactment of § 4327(b).  In this case, the enactment of § 4327(b) has no real effect on the assessment of plaintiff's USERRA claims.  Notwithstanding the enactment of the new provision, the § 1658 statute of limitation was stopped here by the filing of the complaint on October 15, 2007.  Having concluded that § 1658 applied to such claims before October 10, 2008, those USERRA claims accruing prior to October 15, 2003, are time-barred, and the enactment of § 4327(b) did not revive them.  Therefore, to the extent that plaintiff makes USERRA claims based on discriminatory events occurring before October 15, 2003, the motion for summary judgment is due to be granted, as those claims are time-barred.  Nonetheless, there is evidence indicating that plaintiff suffered promotion denials and denials of training opportunities after October 15, 2003, and that his military service may have been a motivating factor.  Consequently, USERRA claims based on discriminatory events that took place on or after October 15, 2003, which are not time-barred, remain viable, and the motion for summary judgment must be denied as to such claims.

E.  Qualified Immunity Of Defendants Baumann And McBee

In their separate motions for summary judgment, defendants Baumann and McBee have asserted that they are entitled to qualified immunity as a shield from plaintiff's § 1983 claims[25]

---

[25]     Count IV of the complaint alleges individual claims against Baumann and McBee under § 1983 not only for racial discrimination in employment, but also for discrimination due to plaintiff's military service.  Other than claiming qualified immunity, neither defendant has

brought against them in their individual capacities.[26]  Under federal law, it is well settled that qualified immunity protects government officials performing discretionary functions from civil suit, and from liability, where their conduct does not violate "clearly established statutory or constitutional rights."  Lassiter v. Alabama A & M Univ., 28 F.3d 1146,1149 (11th Cir. 1994)(citing Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982))(additional citations omitted).  Furthermore, it is the general rule that qualified immunity will protect government actors from liability, and only in "exceptional cases" will the immunity be unavailable as a shield.  Id.  Even so, qualified immunity does not apply in those instances where the law has "been developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place," that the actions violate federal law.  Id.; Crawford v. Carroll, 529 F.3d 961, 978-979 (11th Cir. 2008).  It is not necessary that the facts of the cases relied upon as the "clearly established law" be the same as in the instant case, but they "do need to be materially similar."  Id. at 1150.

Officials seeking the protection of qualified immunity first must prove that they were acting within the scope of their discretional authority when the complained-of acts occurred.  Once the officials establish that they were acting within their discretionary authority, the burden shifts to the plaintiff to demonstrate that qualified immunity is not appropriate.    In this case, there is no dispute

---

questioned whether a "military discrimination" claim can lie against them in their personal capacities.

[26]      To the extent that the claims are brought against Bauman and McBee in their official capacities as mayor and police chief of Hueytoen, the actions are redundant to the claims asserted against the City of Hueytown.  Claims against public officials in their official capacity are simply another way of suing the public employing entity, here the City of Hueytown.

that the act of selecting candidates for promotion or special training is an act within the discretionary authority of both individual defendants.   Accordingly, the court must determine whether the plaintiff's allegations, if true, establish a constitutional violation, and whether the constitutional right in question was clearly established at the time of the alleged violation.   Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001).   Defendants do not seriously dispute that the allegations underlying Goldman's claims constitute a violation of the Equal Protection Clause of the Fourteenth Amendment.   In any event, the Eleventh Circuit Court of Appeals has clearly spoken to this issue, stating:

> The Equal Protection Clause ensures a right to be free from intentional discrimination based upon race, *see Bass v. Bd. of County Comm'rs*, 256 F.3d 1095, 1116 (11th Cir.2001); *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1478 (11th Cir.1991), and gender, *see Downing v. Bd. of Trs. of the Univ. of Ala.*, 321 F.3d 1017, 1022 n. 9 (11th Cir.2003); *Parks v. City of Warner Robins*, 43 F.3d 609, 616 (11th Cir.1995). Accordingly, we have recognized an equal protection right to be free from employment discrimination, *see, e.g., Thigpen v. Bibb County*, 223 F.3d 1231, 1237 (11th Cir.2000), abrogated on other grounds by *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002), and we have found various race- and gender-based employment decisions by public officials, including those concerning discipline, promotions, transfers, reclassifications, and termination, in violation of that constitutional right, *see Alexander v. Fulton County*, 207 F.3d 1303, 1313, 1321 (11th Cir.2000) (affirming a jury verdict of intentional employment discrimination by a black sheriff who made race-based employment decisions concerning white officers "with respect to discipline, promotions, transfers, [and] reclassifications"); *Yeldell v. Cooper Green Hosp., Inc.*, 956 F.2d 1056, 1064 (11th Cir.1992) (holding that intentionally discriminatory hiring and firing practices violated the Equal Protection Clause); *Brown*, 923 F.2d at 1478 (recognizing a right under the Equal Protection Clause to be free from termination because of race).

Williams v. Consolidated City of Jacksonville, 341 F.3d 1261, 1268 (11th Cir. 2003)(footnotes omitted); see also Bryant v. Jones, ___ F.3d ___, 2009 WL 2341737 (11th Cir., July 31, 2009)("We

have often noted the 'patently obvious illegality of racial discrimination in public employment.'")(quoting <u>Smith v. Lomax</u>, 45 F.3d 402, 407 (11th Cir.1995)).  The court in <u>Williams</u> further recognized that it has been "clearly established" since at least 1999 that it is "unlawful for a public official to make a race- or gender-based decision concerning hiring, termination, promotion or transfer to or from an existing position."  341 F.3d at 1272, citing <u>Yeldell v. Cooper Green Hospital, Inc.</u>, 956 F.2d 1056, 1064-65 (11th Cir. 1992).

There can be no real dispute that, if plaintiff was subjected to purposeful racial discrimination in employment by these defendants,[27] the illegality of such was clearly established well before 2004 and qualified immunity cannot protect them.  Consequently, defendants Baumann and McBee have failed to demonstrate that they are entitled to qualified immunity as against plaintiff's claims of racial discrimination in employment.

_____

[27]    The theory of liability asserted against Mayor Baumann rests on the assertion that he uncritically accepted the allegedly discriminatory recommendations of Chief McBee.  This is the so-called "cat's paw" theory of liability.  Last year, the Eleventh Circuit described the theory this way:

> Under a "cat's paw" theory, a non-decisionmaking employee's discriminatory animus may be imputed to a neutral decisionmaker when the decisionmaker has not independently investigated allegations of misconduct.  *See Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1249 (11th Cir. 1998).  "In such a case, the recommender is using the decisionmaker as a mere conduit, or 'cat's paw' to give effect to the recommender's discriminatory animus." *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999) (*per curiam*).

<u>Crawford v. Carroll</u>, 529 F.3d 961, 979 n. 21 (11th Cir. 2008).

While not discussed by the parties, the court finds that qualified immunity *does* shield Baumann and McBee with respect to plaintiff's "military discrimination" claims.[28]  Baumann and McBee have carried their initial summary judgment burdens on qualified immunity by showing (without any real dispute from plaintiff) that the employment decisions they made were within their discretion.  At this point, they are entitled to qualified immunity, unless plaintiff can show tht it does not shield them because the law was so clearly established that any reasonable public official in their shoes would have known that what they were doing was illegal.  Analysis of the qualified immunity defense ordinarily involves a two-step process: first, the court determines whether, in the light most favorable to the non-moving party, the evidence proves a constitutional violation; then, second, if a violation is shown, was the law so clearly established that no reasonable official could not mistake that it was illegal.  Here, the plaintiff's "military discrimination" claim founders on the first step.

At the outset the court has been unable to find any authority for the proposition that a public employee has a *constitutional* right to be free of employment discrimination based on his military service.  While USERRA prohibits an *employer* from so discriminating, no provision of the

_____

[28]       The fact that none of the parties discussed qualified immunity in the context of the Count IV allegations of "military discrimination" pleaded against Baumann and McBee individually makes for a procedural challenge.  Plainly, the individual defendants have asserted qualified immunity as a defense and have shown that their employment decisions (however motivated) were discretionary in nature.  This means that they have carried their initial Rule 56 burden of showing an entitlement to judgment as a matter of law due to qualified immunity, with the burden of refuting qualified immunity shifting to the plaintiff.  It is the plaintiff's burden to show that qualified immunity does not apply, and he has not attempted to do so with respect to the claims of "military discrimination."  Thus, the court is faced with the procedural posture of defendants having invoked qualified immunity and having proved the initial burden of showing that they were acting in a discretionary manner when they made employment decisions affecting the plaintiff.  The plaintiff simply has not taken up the challenge of trying to refute the applicability of qualified immunity.  For the reasons explained in the text, plaintiff would have lost anyway.

constitution does so, and the action created in USERRA lies only against the "employer," not supervisory personnel.  See Townsend v University of Alaska, 543 F.3d 478 (9th Cir. 2008).  Thus, at the first step of the qualified immunity analysis, there is no constitutional or legal theory upon which Baumann and McBee can be held *personally* liable for discriminatory employment decisions based on plaintiff's military service.[29]   Unlike a race discrimination claim, which finds its constitutional roots in the Equal Protection clause, there is no authority for the proposition that being a member of the military is a "suspect classification" or involves a fundamental right for equal protection purposes.[30]   Equal Protection analysis has been confined traditionally to disparate treatment arising due to race, gender, religion, or national origin, not membership in the military.[31] Absent such a right not to be treated differently due to military service, Baumann and McBee personally could do so without legal consequences to themselves.[32]

Because there is no constitutional or federal statutory basis for holding Baumann and McBee personally liable for discriminating against plaintiff due to his military service, plaintiff cannot show a constitutional violation by them.  Without such, there is no need to address the second step of qualified immunity.  Absent a violation of law in this manner by these individual defendants, they

---

[29]   Of course, the city of Hueytown, as plaintiff's employer, is in a different boat.

[30]   Cf. American Federation of Government Employees, AFL-CIO v. U.S., 622 F. Supp. 1109 (N.D. Ga. 1984)(finding that military retirees are not a suspect classification for equal protection purposes).

[31]   The court has no occasion to consider whether being a military service member implicates some First Amendment associational right because that has not been pleaded by the plaintiff.

[32]   Again, their conduct certainly held consequences for the city of Hueytown under USERRA, but not for them personally.

are entitled to qualified immunity, and their motion for summary judgment must be granted with respect to any "military discrimination" claims against them personally.

CONCLUSION

Accordingly, consistent with the foregoing discussion of the evidence presented by both parties in support of and in opposition to the motions for summary judgment, this court determines that the defendants' motions for summary judgment (docs. 20, 22, and 24) are due to be GRANTED as to any promotion and/or training claims arising under Title VII, § 1983, or § 1981 which are based upon promotion and/or training decisions that were made prior to September 7, 2005.

Likewise, the City of Hueytown's motion for summary judgment is due to be GRANTED with respect to any USERRA claims based upon employment decisions made prior to October 15, 2003.  Also, Baumann's and McBee's motions for summary judgment are due to be GRANTED with respect to any "military discrimination" claims against them in their personal capacities under Count IV of the complaint.  Otherwise, all three motions for summary judgment are due to be DENIED.

A separate order will be entered in accordance with the findings set forth herein.

DATED the 4th day of September, 2009.

_____
T. MICHAEL PUTNAM
U.S. MAGISTRATE JUDGE

44